UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MICHAEL FIORITO,                                    Case No. 22-CV-0749 (PJS/TNL)

        Petitioner,

v.                                                                          ORDER

WARDEN J. FIKES,

        Respondent.

MICHAEL FIORITO,                                    Case No. 22-CV-0759 (PJS/TNL)

        Petitioner,

v.

LELE JUNE and FIKES, Wardens,

        Respondents.

MICHAEL FIORITO,                                    Case No. 22-CV-0797 (PJS/TNL)

        Petitioner,

v.

WARDEN THOMAS,

        Respondent.

Michael Fiorito, pro se.

Kristen Elise Rau and Ana H. Voss, United States Attorney's Office, for respondents.

Petitioner Michael Fiorito is serving a 270-month sentence after being convicted by a jury of six counts of mail fraud and one count of conspiracy to commit mail fraud. *See United States v. Fiorito*, No. 07-CR-0212(1) (D. Minn.). For less than nine months of that sentence, Fiorito was housed at the Federal Correctional Institution in Sandstone, Minnesota ("FCI-Sandstone"). *See Fiorito v. Thomas*, No. 22-CV-0797, Kensy Decl. ¶ 3, [ECF No. 27] (D. Minn. Aug. 31, 2022). During his brief stay at FCI-Sandstone, Fiorito filed no fewer than six petitions for a writ of habeas corpus. *See* 28 U.S.C. § 2241; *Fiorito v. Fikes*, No. 22-CV-0486 (ECT/LIB); *Fiorito v. Fikes*, No. 22-CV-0512 (WMW/TNL); *Fiorito v. Fikes*, No. 22-CV-1368 (JRT/TNL). Three of those habeas petitions—the petitions now before this Court—were found to be sufficiently related to each other to justify reassignment to a single district and magistrate judge.

Following reassignment of these three habeas petitions, respondents were directed to answer the petitions, either individually or jointly. Respondents opted to submit a joint answer. Fiorito was provided an opportunity to reply to that answer by no later than October 3, 2022, but he did not avail himself of that opportunity.

Following review of the habeas petitions, respondents' answer, and the exhibits submitted by respondents in support of that answer, the Court concludes that Fiorito is not entitled to habeas relief.  Accordingly, each of his habeas petitions will be denied and these matters dismissed.

## I. FIORITO'S HABEAS PETITIONS

As explained above, this matter is before the Court on three separate habeas petitions filed by Fiorito.  Although the petitions differ in some respects, they share core factual allegations.  The Court will first describe what the petitions have in common, and then describe how the petitions differ.

### A.  Common Features

Each of the habeas petitions now before the Court relates to events that took place at FCI-Sandstone while Fiorito was briefly confined at that facility.  Fiorito alleges that he was subjected to a campaign of harassment, retaliation, and physical abuse throughout his stay.  Fiorito further contends that his treatment was in retaliation for the fact that, prior to being transferred to FCI-Sandstone, he filed dozens (if not hundreds) of administrative grievances and lawsuits against prison staff at various facilities operated by the Bureau of Prisons ("BOP").

According to Fiorito, the most common form this retaliation took was placement in the Special Housing Unit ("SHU") for pretextual reasons.  Like all prisoners housed

in the SHU, Fiorito found his privileges to be greatly curtailed.  Placement in the SHU also precluded Fiorito from participating in recidivism-reduction programming.  *See* 18 U.S.C. § 3632(b).  As will be explained more fully below, a prisoner participating in recidivism-reduction programming is eligible for earlier transfer to a less-restrictive custodial setting or, in some instances, to earlier transfer out of custody and into supervised release.  *See* 18 U.S.C. § 3632(d).  Fiorito claims that by assigning him to the SHU, officials at FCI-Sandstone lengthened the term of his custody—or at least lengthened the time that he would spend in more-restrictive custody—by depriving him of the chance to participate in recidivism-reduction programming.

Another action of prison officials alleged to be retaliatory was that, shortly after his arrival at FCI-Sandstone, Fiorito was directed to pay far more towards restitution for the victims of his offenses than he had previously been directed to pay.  Under the Inmate Financial Responsibility Program ("IFRP"), prison officials may review a prisoner's financial status and may, as the prisoner's financial status changes during the term of imprisonment, adjust the amount that the prisoner is expected to pay towards outstanding financial obligations, such as fines or restitution obligations imposed as part of the sentencing judgment.  *See* 28 C.F.R. § 545.11(b).  Prisoners are not required to participate in the IFRP, but there are significant benefits to doing so, including eligibility for better housing and increased pay for prison jobs.  *See* 28 C.F.R. § 545.11(d).  Fiorito's

4

obligations under the IFRP were substantially increased following his transfer to FCI-Sandstone—a decision that, according to Fiorito, was animated entirely by retaliatory motives.

These allegations and claims provide the framework for each of the habeas petitions now before the Court.  Before evaluating the merits of Fiorito's habeas petitions, however, this Court will briefly explain how the petitions differ from one another.

### B. *Fiorito v. Fikes* ("*Fiorito I*"), No. 22-CV-0749

The habeas petition filed in *Fiorito I* focuses predominantly, though not exclusively, on an infraction of prison rules Fiorito was alleged to have committed in February 2022 and the consequences that followed from that infraction.  According to Fiorito, prison officials placed him in the SHU on or around that date, ostensibly due to possession of unauthorized glasses and medication, but in reality because "[Fiorito] filed grievances against those same staff for denying him medical care."  *Fiorito I*, Petition at 2 [ECF No. 1] (D. Minn. Mar. 24, 2022).  Fiorito further alleges that his placement in the SHU on that occasion did not comport with his constitutional due-process rights.  Finally, Fiorito alleges that, while residing in the SHU, he was denied access to legal materials in violation both of his constitutional rights and of BOP policy.

*C. Fiorito v. June* ("*Fiorito II*"), No. 22-CV-0759

The habeas petition filed in *Fiorito II*, like the petition filed in *Fiorito I*, contends that Fiorito was placed in the SHU without adequate procedural protections.  The petition in *Fiorito II* more fully fleshes out Fiorito's legal argument regarding his due-process claims.

For Fiorito to prove that he was entitled under the Due Process Clause to notice, a hearing, or other procedural protections before being placed in the SHU, he must establish that placement in the SHU deprived him of a protected liberty or property interest.  *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (per curiam).  In *Fiorito II*, Fiorito contends that being placed in the SHU deprived him of a protected liberty interest in two ways.  First, Fiorito alleges that placement in the SHU prevented him from earning time credits under § 3632(b), which in turn threatens to extend the length of his overall detention.  Second, Fiorito alleges that conditions in the SHU at FCI-Sandstone are unusually severe, even by SHU standards—so severe, in fact, that the SHU conditions constitute an "atypical and significant hardship" that he had a protected liberty interest in avoiding.  *Sandin v. Conner*, 515 U.S. 472, 484 (1991).  Fiorito argues that because placement in the SHU implicated his protected liberty interests, prison officials were required to afford him specific procedural protections prior to or immediately after his transfer to the SHU, such as written notice of the charges against

him and an opportunity to present evidence to refute those charges. *See Wolff v. McDonnell*, 418 U.S. 539, 563-64 (1974).

### D. Fiorito v. Thomas ("Fiorito III"), No. 22-CV-0797

The habeas petition filed in *Fiorito III* mostly concerns the adjustment of Fiorito's financial responsibilities under the IFRP. Fiorito regards this adjustment as unlawful in and of itself—that is, Fiorito believes that he is simply being made to pay more under the IFRP than is permitted by law. But Fiorito also contends that the adjustment has caused two secondary effects that are also unlawful. First, Fiorito claims that his failure to participate in the IFRP limits the availability of time credits under § 3632(b), which in turn may lengthen the time that he must spend in prison. Second, Fiorito argues that his increased financial obligations make unlawful the conditions of his confinement. For example, Fiorito argues that without additional money for himself, he will be unable to purchase enough stamps or typewriter ribbons to litigate effectively, amounting to an unconstitutional denial of access to the courts.

## II. ANALYSIS

As an initial matter, the Court notes that Fiorito has not filed a reply to respondents' answer to his petition, despite being expressly authorized by the Court to do so. Nor has Fiorito submitted any documentary evidence in support of any of his claims in any of his three habeas proceedings now before the Court. Accordingly, both

7

the arguments and the evidence submitted by respondents in opposition to the habeas

petitions have gone unrebutted by Fiorito.  This is a problem for Fiorito, as he bears the

burden of proof in these habeas proceedings.  *See Espinoza v. Sabol*, 558 F.3d 83, 89 (1st

Cir. 2009); *Whitaker v. Fisher*, No. 10-3595 (RHK/AJB), 2011 WL 1542066, at *4 (D. Minn.

Mar. 28, 2011) (collecting cases).  It is difficult to see how Fiorito, who has barely

participated in these proceedings after filing his habeas petitions,[1] could meet his

burden.

In any event, the Court has examined Fiorito's habeas petitions, respondents'

answer to the petitions, and the evidence submitted by respondents in support of the

answer.  After review, the Court concludes that most of the claims raised by Fiorito in

the habeas petitions attack the validity of the conditions of his confinement rather than

the fact or duration of his confinement; those claims are therefore not cognizable on

habeas review.  To the extent that Fiorito brings claims that *are* cognizable on habeas

review, he has not established—or, for that matter, even adequately pleaded—that he is

entitled to relief.  All three habeas petitions will therefore be denied.

---

[1] Fiorito has, however, been actively litigating both in state and federal court throughout that period.  *See Fiorito v. Fikes*, No. 22-CV-1368 (JRT/TNL) (D. Minn.); *Fiorito v. Southwick*, No. 22-CV-2128 (PJS/TNL) (D. Minn.); *Fiorito v. United States*, No. 22-CV-2597 (PJS/TNL); *Fiorito v. Palmer*, No. 58-CV-22-273 (Minn. Dist. Ct.).

*A. Conditions of Confinement*

"If the prisoner is not challenging the validity of his conviction or the length of his detention, such as loss of good time, then a writ of habeas corpus is not the proper remedy." *Kruger v. Erickson*, 77 F.3d 1071, 1073 (8th Cir. 1996) (per curiam).[2]  Put another way, claims regarding the *fact* of confinement (i.e., whether a prisoner should be in custody at all) and the *duration* of confinement (i.e., whether a prisoner will be detained for too long) are appropriately raised through a habeas petition.  By contrast, claims regarding the *conditions* of a prisoner's confinement may be raised in federal court only through a non-habeas civil action—for example, through claims under 42 U.S.C. § 1983, *Bivens*,[3] or the Federal Tort Claims Act, 28 U.S.C. § 1346(b).  *See Spencer v. Haynes*, 774 F.3d 467, 469-71 (8th Cir. 2014).

The rationale for separating habeas actions from (non-habeas) civil actions is, in large part, procedural.  Litigants must pay a substantially higher filing fee when filing a civil complaint than when filing a habeas petition.  *See* 28 U.S.C. § 1914.  If the litigant is a prisoner, he will have to pay the entire amount of the statutory filing fee for a civil complaint (though not for a habeas petition), even if he is found to qualify for *in forma*

---

[2] Fiorito undoubtedly knows this, as he has been told this many times by federal courts. *See, e.g.*, *Fiorito v. Entzel*, 845 F. App'x 706, 707 (9th Cir. 2021) (per curiam); *Fiorito v. Entzel*, 829 F. App'x 192, 193-94 (9th Cir. 2020) (per curiam); *Fiorito v. Anderson*, No. 5:18-CV-0506-JFW-KES, 2020 WL 5224349, at *3 (C.D. Cal. Apr. 10, 2020); *Fiorito v. Saad*, No. 2:16-CV-36, 2017 WL 3712913, at *6 (N.D. W.Va. July 10, 2017).

[3] *See Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

*pauperis* status.  *See* 28 U.S.C. § 1915(b).  Dismissal of a habeas petition does not result in

the assessment of a "strike" against the litigant pursuant to § 1915(g), while dismissal of

a civil complaint might.  The pleading standards and procedural rules for habeas

actions differ from those applied to civil actions.  And so on.  For these reasons, courts

strictly police whether claims brought by prisoners are raised through the appropriate

procedural vehicle, with claims not raised through the appropriate procedural vehicle

subject to dismissal.[4]  *See, e.g., Rodriguez v. D.O.C.*, No. 21-CV-2659 (SRN/DTS), 2022

WL 1110202, at *2-4 (D. Minn. Mar. 2, 2022).

The line that separates habeas claims from conditions-of-confinement claims is

not always clear, but most claims for relief brought by prisoners can readily be placed in

one category or the other.  For example, a prisoner looking to challenge the validity of

her conviction cannot do so through a non-habeas civil action, as such a claim goes to

the validity of her detention.  *Cf. Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994) (barring

---

[4] Where a pleading is merely *mislabeled*, it may be (with the litigant's permission) reinterpreted into the appropriate procedural vehicle and allowed to proceed accordingly.  *See Spencer v. Haynes*, 774 F.3d 467, 471 (8th Cir. 2014).  But pleadings raising both habeas and non-habeas claims are generally not amenable to reinterpretation because, even if reinterpreted, the pleading would still raise claims that cannot be raised through that procedural vehicle.  *See Malcom v. Starr*, No. 20-2503 (MJD/LIB), 2021 WL 931213, at *2 (D. Minn. Mar. 11, 2021).  In any event, Fiorito is already litigating many of the claims found in this order to be non-habeas claims in other lawsuits that he has pending in this this District.  *See Fiorito v. Drummy*, No. 22-CV-0923 (PJS/TNL); *Fiorito v. Lilo*, No. 22-CV-0925 (PJS/TNL); *Fiorito v. Kensy*, No. 22-CV-0927 (PJS/TNL).

non-habeas claims in federal court that necessarily imply the invalidity of the plaintiff's

conviction or sentence).  Conversely, a prisoner alleging that prison officials have been

deliberately indifferent to her medical needs could not do so through a habeas petition,

because the litigant's constitutional entitlement to medical care has nothing to do with

whether she should be incarcerated in the first place.  *See Glaus v. Anderson*, 408

F.3d 382, 387-88 (7th Cir. 2005).

As the Court discusses below, a few of Fiorito's claims straddle the line that

separates habeas petitions from non-habeas civil actions.  But many of the claims raised

by Fiorito in these habeas proceedings clearly fall on the non-habeas side of the ledger:

- The petition in *Fiorito I* claims that conditions in the SHU deprive Fiorito of access to the courts.  Similarly, the petition in *Fiorito III* claims that the increased financial obligations placed upon Fiorito under the IFRP impede his access to the courts.  Whether prison officials have afforded Fiorito sufficient access to the courts is unrelated to the fact or the duration of Fiorito's confinement, and the claim therefore cannot be raised in habeas litigation.  *See, e.g.*, *Jupiter v. Warden, USP Lewisburg*, 237 F. App'x 726, 727-28 (3d Cir. 2007) (per curiam); *Mitchell v. Hendrix*, No. 2:19CV00074-KGB-JTR, 2020 WL 8258731, at *1 (E.D. Ark. Apr. 16, 2020).

- The petition in *Fiorito II* contends that conditions in the SHU amount to violations of various other constitutional rights.  For example, Fiorito alleges that he has been denied "all access to the media for no penological reason in violation of the first amendment," *Fiorito II*, Petition at 9 [ECF No. 1], that prisoners in the SHU are subjected to 24-hour lighting, *id.* at 10, and that prisoners are denied access to personal property, *id.*  Again, these are quintessential *conditions* claims, not habeas claims.

- The petition in *Fiorito III* alleges that prison officials have unlawfully withheld certain privileges, such as telephone and email use, on account

of Fiorito's failure to comply with his revised payment schedule under the IFRP. *See Fiorito III*, Petition at 19 [ECF No. 1]. This claim, too, is entirely unrelated to whether the fact or duration of Fiorito's confinement is lawful.

Because these conditions-of-confinement claims cannot be pursued in a habeas proceeding, each of these claims will be dismissed without prejudice.

Two of Fiorito's claims require more detailed analysis. First, Fiorito alleges that he was entitled to additional procedural protections before being placed in the SHU. Second, Fiorito alleges that his revised payment obligations under the IFRP run afoul of federal law and BOP policy. The Court concludes, for the reasons explained below, that these claims are also—at least in part—conditions-of-confinement claims not cognizable on habeas review. To the extent that these claims can be raised in a habeas proceeding, Fiorito has not established that he was deprived of a protected liberty interest through placement in the SHU and has not established that his revised financial obligations under the IFRP are contrary to law.

### B. Due Process and SHU Placement

Insofar as *Fiorito I* and *Fiorito II* could be said to have a central claim for relief, that claim could be described as follows: Most federal prisoners, including Fiorito, are entitled to First Step Act time credits ("FTCs") as a reward for having completed "evidence-based recidivism reduction programming or productive activities." 18 U.S.C.

§ 3632(d)(4)(A).  Those FTCs, when applied near the conclusion of a sentence, can be used to accelerate the date on which the prisoner is transferred from prison to prerelease custody (such as home confinement or a residential reentry center) or supervised release.  *See* 18 U.S.C. § 3632(d)(4)(C).  But prisoners who would otherwise be eligible for FTCs are deemed not to be "successfully participating" in recidivism-reduction programming while they reside in the SHU.  *See* 28 C.F.R. § 523.41(c)(4).  Every day spent by Fiorito in the SHU, then, was a day that Fiorito might otherwise have been earning FTCs (assuming he met all of the other requirements) but could not due to his placement in the SHU.

It is well established that the added restrictions on daily living that come with SHU placement do not generally implicate a protected liberty interest and that prisoners therefore are not usually entitled to notice, a hearing, or other procedural protections before being placed in the SHU.  *See Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003) ("We have consistently held that a demotion to segregation, even without cause, is not itself an atypical and significant hardship.").  It is also well established, as explained above, that an attack on the conditions in the SHU is not cognizable in a habeas proceeding.  Until very recently, though, transfer to a federal SHU did not, by itself, affect the amount of time that an inmate would spend in prison.  Fiorito argues that this changed with the passage of the First Step Act and the creation of FTCs that are

13

tied to recidivism-reduction programming.  Now, argues Fiorito:  (1) there is a direct

nexus between placement in the SHU and the length of a prisoner's confinement;

(2) because placement in the SHU now potentially lengthens a prisoner's confinement,

such placement does implicate a protected liberty interest; and (3) an attack on the

legality of a SHU placement amounts to an attack on the legality of the duration of

confinement (rather than merely an attack on the conditions in the SHU) and thus can

be brought through a habeas petition.

Fiorito's argument is far from frivolous.  Federal prisoners have long been

entitled to time credits resulting from good behavior, *see* 18 U.S.C. § 3624(b), and

challenges to the loss of good-time credits following prison disciplinary proceedings are

a regular and unexceptional feature of modern habeas litigation.  *See Preiser v.

Rodriguez*, 411 U.S. 475, 487-88 (1973); *Portley-El v. Brill*, 288 F.3d 1063, 1066-67 (8th Cir.

2002).  Accordingly, it is not absurd to argue that FTCs, like good-time credits, might

also implicate protected liberty interests that could be vindicated through a habeas

petition.

Ultimately, however, this Court does not agree with Fiorito's argument because

of two critical differences between FTCs and good-time credits.  First, good-time credits

entitle a prisoner to a reduction in his sentence, period.  FTCs are not quite so

straightforward.  In contrast to prisoners who earn good-time credits, prisoners who

14

earn FTCs may not be able to *apply* those FTCs.  *See* 18 U.S.C. § 3624(g)(1)(D).  Instead,

application of FTCs is contingent on maintaining a minimal or low risk of recidivism[5] as

assessed by the BOP or, alternatively, on receiving an exception to that requirement

from the warden of the facility where the prisoner is detained.  *Id.*  Further, even when a

prisoner may apply FTCs, § 3632(d)(4)(C) directs that those FTCs may be applied by the

BOP "toward time in prerelease custody *or* supervised release" (emphasis added).

Prerelease custody, however, is just another form of BOP custody, *see* 18 U.S.C.

§ 3624(g)(2), and "[a] legal action seeking transfer from one form of BOP custody to

another (like a legal action seeking transfer from one BOP facility to another) is not a

challenge to the fact or duration of confinement."  *Johnson v. Birkholz*, No. 21-CV-2017

(PJS/LIB), 2022 WL 3135304, at *1 (D. Minn. Aug. 5, 2022).  Thus, even if Fiorito had

never been transferred to the SHU and had received credit for every FTC that he could

possibly have earned, the duration of Fiorito's confinement would not necessarily be

reduced by even a single day.[6]  This contingency makes it doubtful that FTCs are a

---

[5]Unsurprisingly, Fiorito has not managed to persuade the BOP that he is at low risk of recidivism.  *See Fiorito III*, Derrick Lee-Lo Decl. ¶ 9 [ECF No. 29]; *cf. United States v. Fiorito*, No. 07-CR-0212 (PJS/JSM), 2022 WL 2315036, at *2 (D. Minn. June 28, 2022) (noting that Fiorito "has been convicted of numerous crimes, and sentenced to custody on numerous occasions, and yet he has always returned to crime"); *Fiorito III*,  Kensy Decl. ¶ 14 [ECF No. 27] (attesting that Fiorito was recently found in possession of counterfeit property and punished with loss of good-time credits after administrative hearing).

[6] Fiorito asserts that the BOP is required first to apply any FTCs (up to credit for

(continued...)

protected liberty interest.  *See Moorman v. Thalacker*, 83 F.3d 970, 973 (8th Cir. 1996) ("To

be so considered, the state must have created a mandatory scheme which *necessarily*

affects the duration of a prisoner's sentence." (emphasis added)).

Second, unlike good-time credit accumulated under § 3624(b), FTCs are not a

general entitlement.  Instead, prisoners are merely afforded the *opportunity* to earn FTCs

by participating in recidivism-reduction programming.  Although FTCs themselves are

a recent creation, many courts examining similar time-credit schemes have held that the

loss of a mere *opportunity* to accumulate credit towards a sentence is not sufficient to

create a protected liberty interest.  *See, e.g.*, *Bloom v. Fed. Bureau of Prisons*, No. 19-21589

(KMW) (SAK), 2022 WL 341200, at *2 (D.N.J. Feb. 4, 2022) (noting that "[w]hile

prisoners do have a liberty interest in retaining those good time credits they have

already earned, prisoners have no constitutionally protected liberty interest in an

opportunity to earn additional good time or similar credits" (internal citation omitted));

---

[6](...continued)
12 months) to accelerate the date on which the prisoner is transferred to supervised
release, and then may apply any subsequent FTCs to accelerate the date on which the
prisoner is transferred to prerelease custody.  But Fiorito provides no support for this
assertion, and the Court has not located any such limitation in the relevant statutes or
regulations.  Instead, those provisions state only that "the Director of the Bureau of
Prisons may transfer the prisoner to begin any such term of supervised release at an
earlier date, not to exceed 12 months," 18 U.S.C. § 3624(g)(3), with no further direction
about whether the application of credits to accelerate transfer to supervised release
takes precedence over application of credits to accelerate transfer to prerelease custody.
*See also* 28 C.F.R. § 523.44.

*Hendley v. Weaver*, No. 2:20-CV-00044-BSM-JTR, 2021 WL 852169, at *2 (E.D. Ark. Jan. 19, 2021) (noting that "losing the *opportunity* to earn good time credits that might, *if earned*, reduce the amount of time served also does not invoke the protections of the Due Process Clause"); *Holman v. Cruz*, No. 08-CV-0647 (RHK/JJK), 2008 WL 5244580, at *4-5 (D. Minn. Dec. 15, 2008).

The general rule that the loss of an opportunity to earn a reduction in sentence does not amount to infringement of a protected liberty interest makes particular sense in the context of FTCs, as the opportunity to participate in recidivism-reduction programming can be lost for several reasons, including reasons having nothing to do with the conduct or blameworthiness of the prisoner.  For example, a prisoner who is temporarily transferred from the custody of the BOP to a non-BOP facility to testify at trial, *see* 28 U.S.C. § 2241(c)(5), would be unable to successfully participate in BOP recidivism-reduction programming during the time that the prisoner remained outside the custody of the BOP, *see* 28 C.F.R. § 523.41(c)(4)(iii).  The same would be true of a prisoner who is transferred to a hospital for extended treatment of a serious medical need.  *See id.* § 523.41(c)(4)(ii).  The statute and accompanying regulations betray no expectation that FTC credits could reasonably be regarded as an entitlement, rather than as a benefit that a prisoner might or might not be able to earn at various times during his detention.  This is too flimsy an expectation to give rise to a protected liberty

interest.  And because the opportunity to earn FTCs is not a protected liberty interest, Fiorito was not entitled to due process before he lost that opportunity by getting sent to the SHU.

Finally, Fiorito alleges that his placement in the SHU violated his due-process rights in one other respect.  According to Fiorito, the conditions at the FCI-Sandstone SHU are especially terrible—so terrible, in fact, that they could be regarded as an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life," thereby giving him the right to due process before having to endure those conditions.  *Sandin*, 515 U.S. at 484.  The Court is skeptical about Fiorito's allegation. The Court does not recall ever hearing a similar allegation from an inmate at FCI-Sandstone, and the Court knows Fiorito to be extremely dishonest.  But even if Fiorito is correct that the SHU at FCI-Sandstone represents an especially severe deviation from ordinary prison conditions, this aspect of Fiorito's due-process claim would amount to an attack on the conditions of his confinement, not the fact or duration of the confinement.  Like Fiorito's other conditions-of-confinement claims, then, this aspect of his due-process claim cannot be raised in a habeas proceeding.

*C. IFRP Claims*

As part of the sentencing judgment in his criminal case, Fiorito was ordered to pay $338,529.89 in restitution to the victims of his offenses. *See United States v. Fiorito*, No. 07-CR-0212(1), Sentencing Judgment at 5 [ECF No. 436]. The sentencing judgment also established a floor, though not a ceiling, for Fiorito's payment obligations during his term of imprisonment. "While incarcerated, [Fiorito] must make payments as follows: If [Fiorito] is working UNICOR, he must make monthly payments of at least 50 percent of his earnings. If [Fiorito] is not working UNICOR, he must make quarterly payments of at least $25." *Id.* at 6.

A sentencing judgment is, of course, not self-executing. For the duration of the prisoner's term of incarceration, the sentencing court relies upon the BOP to enforce the terms of the judgment. "The purpose of the IFRP is to ensure compliance with the criminal judgment: 'namely, the timely payment of whatever sum the court has ordered him to pay.'" *Jones v. Fikes*, No. 20-CV-1341 (SRN/HB), 2021 WL 536135, at *4 (D. Minn. Jan. 19, 2021) (quoting *McGee v. Martinez*, 627 F.3d 933, 936 (3d Cir. 2010)), *report and recommendation adopted*, 2021 WL 533700 (D. Minn. Feb. 2, 2021). Thus, through the procedures set forth in § 545.11, the BOP can assess and collect amounts due under the sentencing judgment. Participation in the IFRP is voluntary, although restrictions are placed on prisoners who do not participate. *See* 28 C.F.R. § 545.11(d).

19

Fiorito's ability to make payments towards his restitution obligation was reassessed following his transfer to FCI-Sandstone.  Immediately after arrival, Fiorito's monthly obligations were increased from $25 per quarter (the minimum established by the sentencing judgment) to $45 per quarter.  *Fiorito III*, Kensy Decl. ¶ 11 [ECF No. 27].  Later, "[a]fter observing substantial deposits into [Fiorito's] trust fund account statement, a determination was made to increase his IFRP payment to $242 per month beginning in February 2022."  *Id*. ¶ 12.  Fiorito agreed to both changes.  *Id.* Exs. E-F [ECF Nos. 27-5 & 27-6].

Fiorito raises essentially six claims for relief regarding his IFRP obligations.  First, Fiorito claims that his increased financial obligations conflict with the sentencing judgment and therefore that, by increasing his IFRP payments, the BOP is not lawfully carrying out the sentencing judgment.  Second, Fiorito claims that the revised IFRP payment schedules were established in a manner contrary to § 545.11.  Third, Fiorito claims that any consequences imposed for failure to agree to the increased payment schedules would be imposed in violation of the Inmate Discipline Program, 28 C.F.R. § 541.1 et seq.  Fourth, Fiorito claims that several of the individual consequences that would be imposed should he fail to abide by the revised IFRP payment schedules amount to violations of his constitutional rights.  Fifth, Fiorito claims that his increased IFRP payments leave him with so little money for living expenses that his resulting

living conditions amount to a deprivation of his constitutional rights.  Sixth, Fiorito

claims that a failure to make payments under the IFRP can be punished through the

denial of an opportunity to earn FTCs and that he is therefore entitled to procedural

protections consistent with due process before his IFRP obligations are increased.

The first claim—that Fiorito's revised payment obligations conflict with the

sentencing judgment—is cognizable in a habeas proceeding because it amounts to an

attack on the execution of the sentence.  *See Matheny v. Morrison*, 307 F.3d 709, 711-12

(8th Cir. 2002); *Jones v. Fikes*, 2021 WL 536135, at *1 (noting that "in limited

circumstances, a federal inmate may challenge the fashion in which prison officials

calculate and impose IFRP payments, when it can be shown that those calculations are

inconsistent with an express command of the sentencing judge, by arguing that the

prison's actions constitute an improper execution of that sentence." (cleaned up)).  The

claim is meritless, however.  Fiorito's sentencing judgment established the *minimum* that

he must pay towards his restitution obligation while incarcerated, but the judgment is

silent regarding whether Fiorito can lawfully be made to pay—or, in this case,

voluntarily agree to pay—amounts above that minimum.  *See United States v. Fiorito*,

No. 07-CR-0212(1), Sentencing Judgment at 6 [ECF No. 436] (requiring Fiorito to "make

quarterly payments of *at least* $25" (emphasis added)).  A payment schedule calling for

Fiorito to pay more than the bare minimum required under the sentencing judgment is

in no way inconsistent with that judgment and thus cannot be deemed to be an improper execution of the sentence.

Whether Fiorito's second claim—that BOP officials violated § 545.11 in establishing the revised payment schedule—is cognizable in a habeas proceeding is not clear.  That said, respondents have provided evidence that the revised payment schedules were established due to increased deposits to Fiorito's inmate trust account and comply with the limits established by § 545.11.  *See Fiorito III*, Kensy Decl. ¶¶ 12-13 & Ex. G [ECF Nos. 27 & 27-7].  Fiorito has submitted no evidence to the contrary.  Thus, even assuming that this claim is cognizable in these proceedings, Fiorito has not established that he is entitled to relief.

Fiorito's third, fourth, and fifth claims relate to the conditions of confinement, not to the execution of Fiorito's sentence, and are therefore not cognizable in a habeas action.  The claims are also without merit.  "Prisoners are not entitled, constitutionally or otherwise, 'to any of the benefits agreeing to participate in the IFRP would provide, such as a work detail outside the prison perimeter, a higher commissary spending limit, a release gratuity, or pay beyond the maintenance pay level.'"  *Jordan v. Holt*, 488 F. App'x 587, 588 (3d Cir. 2012) (per curiam) (quoting *United States v. Lemoine*, 546 F.3d 1042, 1049 (9th Cir. 2008)).  Nor do any of the consequences of failing to abide by the IFRP payment schedule amount to the deprivation of a protected liberty interest to

which due-process protections would attach.  *See Cervantes v. Cruz*, No. 07-CV-4738

(DWF/JJK), 2009 WL 76685, at *5 (D. Minn. Jan. 8, 2009).  And Fiorito's claim that the

increased financial obligations render his living conditions *ipso facto* unconstitutional

due to, inter alia, his inability to purchase typewriter ribbons is utterly implausible;

many prisoners subsist on far less money than remains available to Fiorito after his

IFRP payments are made.

Finally, Fiorito's sixth claim—that his failure to make payments under the IFRP

might prevent him from earning FTCs—fails for the same reason that his claim that he

is entitled to due process before he is placed in the SHU failed:  The loss of an

opportunity to earn FTCs is not a liberty interest protected by the Due Process Clause

and does not necessarily amount to a challenge to the fact or duration of Fiorito's

confinement.  But the claim also fails for a more fundamental reason:  It appears to be

false.  A prisoner who does not participate in the IFRP neither loses FTCs already

earned nor forgoes an opportunity to earn FTCs in the future.  *See* 28 C.F.R. § 545.11(d).

Fiorito's allegation that staff at FCI-Sandstone have instituted a policy that permits

officials to withhold or retract FTCs from an inmate who fails to make restitution

payments, *see Fiorito III*, Petition ¶ 2 [ECF No. 1], is (1) not supported by evidence and

(2) *contradicted* by evidence submitted by respondents that loss of FTCs or the

opportunity to earn FTCs has never been imposed as a policy at FCI-Sandstone, *see id.*
Kensy Decl. ¶ 14 [ECF No. 27].

Each of Fiorito's claims related to the IFRP are not cognizable on habeas review,
are without merit, or both.  Accordingly, the IFRP claims will also be denied.

### *D.  Conclusion*

Having denied every claim raised in Fiorito's three habeas petitions, the Court
will dismiss these cases.  Only one other matter merits further comment:  In *Fiorito II*,
Fiorito filed a motion for leave to file an affidavit under seal.  *See* ECF No. 7 (affidavit);
ECF No. 8 (motion).  The affidavit concerns, very broadly speaking, allegations of
unlawful conditions at FCI-Sandstone.  Any claims for relief premised on those
allegations would not be cognizable in a habeas proceeding, and any concerns that
revealing the allegations to respondents would invite retaliation would seem to be
mooted by Fiorito's transfer away from FCI-Sandstone after the filing of the motion and
affidavit.  Nevertheless, the Court will grant Fiorito's motion and direct that these
docket entries remain sealed until December 31, 2026 (well after Fiorito is scheduled to
be released from BOP custody), with access to the documents made available only to
the Court, the attorneys representing respondents (who have already seen the
documents), and Fiorito himself.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.      The petitions for a writ of habeas corpus of petitioner Michael Fiorito are

         DENIED.

2.      These matters are DISMISSED.

3.      Fiorito's motion for leave to file affidavit under seal [*Fiorito v. June*, No. 22-

         CV-0759 (PJS/TNL), ECF No. 8] is GRANTED.  Both the motion and the

         affidavit of Fiorito filed along with that motion [ECF No. 7] will remain

         sealed until December 31, 2026, with access available only to the Court,

         the attorneys representing respondents, and Fiorito himself.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: November 3, 2022                    s/Patrick J. Schiltz_____
                                           Patrick J. Schiltz, Chief Judge
                                           United States District Court